<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHAMBERS OF<br>**SUSAN D. WIGENTON**<br>UNITED STATES DISTRICT JUDGE | MARTIN LUTHER KING COURTHOUSE<br>50 WALNUT ST.<br>NEWARK, NJ 07101<br>973-645-5903 |

May 5, 2025

Sammi Malek
United States Attorney's Office
District of New Jersey
970 Broad Street
7th Floor
Newark, NJ 07102
*Counsel for United States of America*

Alexander John Hasapidis-Sferra
United States Department of Justice, Antitrust Division
New York Office
201 Varick Street
New York, NY 10014
*Counsel for United States of America*

Michael Khoo
United States Department of Justice, Criminal Division
1400 New York Avenue, NW
Suite 9424
Washington, D.C. 20530
*Counsel for United States of America*

Stephen Sola
United States Department of Justice, Criminal Division
Money Laundering & Asset Recovery Section
1400 New York Avenue, NW
Washington, D.C. 20530
*Counsel for United States of America*

Jeffrey G. Garrigan
Cammarata, Nulty, & Garrigan, L.L.C.
549 Summit Avenue
Jersey City, NJ 07306
*Counsel for Defendant*

Christopher L. Patella
868 Broadway
Bayonne, NJ 07002
*Counsel for Defendant*

**LETTER OPINION FILED WITH THE CLERK OF THE COURT**

Re:     *United States v. William Panzera*
        **Criminal Action No. 19-390 (SDW)**

Counsel:

Before this Court is Defendant William Panzera's motion for acquittal under Federal Rule of Criminal Procedure ("Rule") 29 or a new trial under Rule 33. (D.E. 217 ("Mot.").) This Court having considered the parties' submissions, and for the reasons stated herein, Defendant's motion is **DENIED**.

**BACKGROUND & PROCEDURAL HISTORY**

This Court assumes the parties' familiarity with the underlying facts and procedural history of this case. The operative indictment is the Third Superseding Indictment, which charges Defendant with one count of conspiracy to distribute and possess with intent to distribute controlled substances and controlled substance analogues and one count of conspiracy to launder monetary instruments (international promotional money laundering). (D.E. 127.) As relevant here, proving conspiracy requires proving that Defendant knew of the conspiracy's illegal goal and agreed to work toward that goal. *United States v. Boria*, 592 F.3d 476, 481 (3d Cir. 2010); *United States v. Mastrangelo*, 172 F.3d 288, 291 (3d Cir. 1999).

Defendant's jury trial began on January 7, 2025. (D.E. 181.) Among the government's witnesses were two of Defendant's alleged co-conspirators, Michael Action and Nicholas Araya. Both had already pled guilty in connection with the conspiracies that Defendant was charged. (Tr. 493:7–17, 1381:20–1382:14.[1])

Action testified about a few ways that Defendant was involved in the conspiracies. First, Action had Defendant open a hair supply company, Bella Hair, "to send money to [Action's drug supplier] in China," who had a hair company. (*Id.* at 559:25–560:20 (explaining that a hair supply company would "make it look like [the payments were] legal … [m]eaning they were purchasing legitimate hair products from China"), 585:13–15.) Action testified that Bella Hair never "conduct[ed] any hair product-related business" and that he never "receive[d] any hair products through that company." (*Id.* at 572:21–573:1.) Defendant never asked for invoices or about what he was purchasing through Bella Hair. (*Id.* at 983:18–20.) Action testified that Defendant knew not only that Action was not "in the hair business" (*id.* at 573:4–9), but also that he "was involved in drug trafficking" (*id.* at 502:10–14, 819:6–820:5 (providing that Defendant knew Action had previously been imprisoned for drug offenses), 970:17–23).

Action also testified that in 2017, Defendant "wanted to make money," so he "began receiving parcels of drugs on [Action's] behalf." (*Id.* at 519:18–521:3, 607:11–22.) In exchange for around $1,200, Defendant would provide Action with multiple addresses to ship packages to. (*Id.* at 608:13–23, 996:7–15.) According to Action, Defendant "knew there was drugs in the

---

[1] "Tr." refers to the trial transcript in docket entries 205–16.

boxes." (*Id.* at 991:12–992:4 ("He knew I was involved in selling ketamine. … [H]e knew that it wasn't a legitimate business and … he knew that I sold drugs.").)

Finally, Action testified about another company that he asked Defendant to create—one that would receive parcels through air freight. (*Id.* 691:2–692:3.) Defendant "said that he wouldn't put it in his name, that he would look for somebody to do it, and eventually he found somebody …." (*Id.* at 698:21–699:1.) That person was Paul Romano, who opened a company named Stone Bridge Laboratory. (*Id.* at 699:11–700:18.) Action testified that he told Romano in Defendant's presence that the business would be receiving iron oxide, which is used to clean stone floors. (*Id.* at 701:7–16.) According to Action, Defendant knew that floor cleaning was "just the cover story" for Romano. (*Id.* at 702:12–14, 704:17–22, 1047:25–1048:3.) Although he never told Defendant exactly what materials were being shipped (*id.* at 972:15–20), Action testified that Defendant "knew — he knew that I was a criminal. He knew that I was involved in drug distribution and — it wasn't really something that I had to explain to him" (*id.* at 702:17–19.) In connection with the air freight shipments, Action would give Defendant between $5,000 and $20,000, with the understanding that Defendant would give a portion of that money to Romano. (*Id.* at 727:2–9.) Action testified that, as late as 2018, he and Defendant both used burner phones to communicate about the shipments. (*Id.* at 735:3–24.) Defendant never asked what happened to all the iron oxide, and Action and Defendant never discussed any floor cleaning jobs. (*Id.* at 762:20–763:8.) Action was not surprised that Defendant never asked about floor cleaning jobs because Defendant "knew [Action] was in an illegal business." (*Id.* at 763:9–16.)

Araya testified about his arrangement to receive packages for Defendant. He stated that Defendant ultimately offered him $500 to receive packages (*id.* at 1392:5–13), and that when Araya asked what they contained, Defendant repeatedly told him not to worry and that "It's just better if you don't know" (*id.* at 1392:1–4 ("It's nothing. Don't worry about it."), 1393:2–10, 1537:23–1538:9). Araya also testified that he bought a burner phone because Defendant told him to "get another phone" and gave him money to do so. (*Id.* at 1395:17–23, 1398:12–19.) Araya understood that Defendant also had a burner phone, and they communicated through an application that would delete messages after they were received. (*Id.* at 1396:20–1398:1.) Araya described telling Defendant about an incident when one of the packages was opened, and that it apparently contained a "rocky, crystally type of substance." (*Id.* at 1410:3–18.) According to Araya, Defendant made a phone call about the opened package, and either Defendant or the person he called stated "It's the price of doing business." (*Id.* at 1412:6–1413:5, 1558:3–1559:3.) Araya was arrested after accepting a package, and he testified that on June 1, 2017, he showed Defendant the criminal complaint accusing Araya of conspiring to distribute para-fluorobutyryl fentanyl. (*Id.* at 1449:8–1452:21.) Defendant reacted by saying "Don't worry. It's nothing. It's one off. It's legal. Don't worry." (*Id.*) Araya also testified that Defendant had previously provided him with distribution quantities of marijuana, ketamine, and molly. (*Id.* at 1458:19–1459:5.)

On January 23, 2025, witness testimony concluded. (D.E. 192.) That morning, the government had provided the defense with a willful blindness charge that it had neglected to previously include in the jury instructions, despite the charge conference that occurred on January 17, 2025. (D.E. 187; Tr. 2002:1–11, 2023:16–25.) The Court found the charge appropriate and included it in the instructions read to the jury. (Tr. 2030:9–2031:15.) The jury deliberated for

about four and a half hours over two days and returned a guilty verdict on both counts on January 27, 2025. (D.E. 193; D.E. 194.)

On February 10, 2025, Defendant filed the instant motion. He seeks acquittal on the grounds that the evidence was insufficient to prove that he entered into agreements with knowledge of their illegal objectives. (Mot. at 3–8.) Alternatively, he moves for a new trial on the grounds that the jury was wrongfully instructed on willful blindness. (*Id.* at 8–11.) The government opposed on March 14, 2025. (D.E. 219 ("Opp.").)

## STANDARD OF REVIEW

Rule 29 requires the district court to enter a judgment of acquittal for "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). However, the court must "sustain the verdict if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision." *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003) (quoting *United States v. Beckett*, 208 F.3d 140, 151 (3d Cir. 2000)). "[E]vidence may be considered probative even if it is circumstantial." *United States v. Pecora*, 798 F.2d 614, 618 (3d Cir. 1986). In reviewing a motion for acquittal, the court "must be ever vigilant … not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)). The court must view "the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Silveus*, 542 F.3d 993, 1002 (3d Cir. 2008) (quoting *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002)). As such, a defendant bears "a heavy burden" to establish that the trial evidence was insufficient to support a conviction. *United States v. Young*, 334 F. App'x 477, 480 (3d Cir. 2009).

The Rule 33 standard is "more general; a court 'may vacate any judgment and grant a new trial if the interest of justice so requires.'" *United States v. Tiangco*, 225 F. Supp. 3d 274, 279 (D.N.J. 2016) (citing Fed. R. Crim. P. 33). The court does not "view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). However, "a district court … can order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *Silveus*, 542 F.3d at 1004–05 (quoting *Johnson*, 302 F.3d at 150). "Such motions are not favored and should be 'granted sparingly and only in exceptional cases.'" *Id.* at 1005 (quoting *Gov't of V.I. v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)).

## DISCUSSION

### a. Acquittal

The evidence in this case is sufficient to sustain the conviction. Action testified repeatedly that Defendant knew that Action was a drug dealer. (Tr. 702:12–19 ("He knew — he knew that I

4

was a criminal. He knew that I was involved in drug distribution and — it wasn't really something that I had to explain to him."), 819:6–12 ("He knew that I was involved in drug trafficking."), 970:17–23 ("I'm pretty sure that he knew"), 991:16–20 ("[H]e knew that it wasn't a legitimate business and … he knew that I sold drugs").) He also testified that Defendant "knew there was drugs in the boxes." (*Id.* at 992:4.) Action's statements are consistent with his description of events—that Defendant came to him looking to make money, facilitated opening businesses that did not actually offer any services, and accepted over a thousand dollars for receiving packages that he was instructed not to open.

Araya's testimony is also consistent with Defendant's knowledge of what was in the packages. Araya testified that Defendant told him it was better if he did not know what the packages contained, facilitated his use of a burner phone, and knew that at least one box contained a "rocky, crystally type of substance." (*Id.* at 1410:10–18.) Defendant was also aware that Araya's involvement with the packages led to his arrest for conspiring to distribute para-fluorobutyryl fentanyl. (*Id.* at 1451:1–1452:6.)

It is not necessary that Defendant was ever expressly told that he was importing illegal drugs or expressly agreed to do so. Conspiracy can be proven "entirely through circumstantial evidence." *United States v. Williams*, 974 F.3d 320, 370 (3d Cir. 2020). Here, the jury heard circumstantial evidence that rationally supports Defendant's knowledge that he was involved in drug trafficking and money laundering. This is enough to preclude the Court from overturning the conviction.[2] *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 432 (3d Cir. 2013) ("Unless the jury's conclusion is irrational, it must be upheld."). Accordingly, Defendant's motion for acquittal under Rule 29 is denied.

   b. **New Trial**

Defendant also fails to meet the high standard for a new trial. As this Court stated on the record on January 23, 2025, the government's delay in presenting the willful blindness charge to the defense was not so untimely as to justify its exclusion. (Tr. 2030:9–22.)

The charge was also appropriate given the facts of the case. Defendant denied knowledge that he was involved in a drug trafficking or money laundering conspiracy, and the government needed to establish Defendant's mental state to meet its burden. The charge allowed the jury to find that Defendant had knowledge if he "deliberately closed his eyes to what would otherwise

---

[2] Defendant argues that Action's "opinion as to why [he] believed [Defendant] 'should have known' what he was ordering from China" should not have been admitted under Federal Rule of Evidence 701. (Mot. at 6, 8 ("[Defendant's] conviction was based on pure speculation and conjecture as to [his] subjective knowledge ….").) The Court declines to reach this argument as it is raised in the Rule 29 motion when no objection was made during trial. *United States v. Jones*, 404 F. Supp. 529, 540 (E.D. Pa. 1975), *aff'd*, 538 F.2d 321 (3d Cir. 1976) ("[A]bsen[t] … plain error, matters not called to the attention of the trial judge cannot be subsequently raised in the post trial stages of the proceeding."). To the extent it is raised as part of the Rule 33 motion, it is unpersuasive because, even without Action's testimony as to what he believed Defendant knew, there is sufficient circumstantial evidence to support the conviction. *Tiangco*, 225 F. Supp. at 279 (quoting *United States v. Crim*, 561 F. Supp. 2d 530, 533 (E.D. Pa. 2008), *aff'd*, 451 F. App'x 196 (3d Cir. 2011)) ("A Rule 33 motion may also be based on an alleged error … at trial. Borrowing the appellate concept of harmless error, district courts have held that a new trial will be ordered when it is 'reasonably possible that such error … substantially influenced the jury's decision.'").

have been obvious to him." (*Id.* at 2065:18–25.) It was appropriately subjective, instructing the jury that, to find knowledge based on willful blindness, the evidence must support that Defendant, "himself, actually subjectively believed that there was a high probability" of the necessary facts and that he "consciously took deliberate actions to avoid learning or used deliberate efforts to avoid knowing about the existence of these facts and circumstances." (*Id.* at 2066:1–23.)

The charge here also clearly regarded knowledge, not intent. Its first sentence advised the jury that Defendant "denies having had the requisite knowledge as described above." (*Id.* at 2065:18–19.) It continued, "[w]hen, as in this case, *knowledge* of a particular fact or circumstance is an essential part of the offense charged, the Government may prove that [Defendant] had the requisite *knowledge* if the evidence proves …." (*Id.* at 2065:20–23 (emphasis added).) The charge's format clearly distinguished knowledge and intent instructions—under "Proof of required state of mind," it included an instruction for "Intentionally" separate from one for "Knowingly." (*Id.* at 2062:12–2064:8). There is no reason to believe that the jury misconstrued the instructions and used the willful blindness instruction to "establish the purposeful intent needed to enter into an unlawful agreement," as Defendant suggests. (Mot. at 10.) The willful blindness instruction is often included in conspiracy cases, and the defense does not identify a valid reason to depart from that norm here. *See, e.g.*, *Caraballo-Rodriguez*, 726 F.3d at 425; *Brodie*, 403 F.3d at 148.

Finally, Defendant argues that his actions were not consistent with willful blindness—that "[b]eing misled is a far cry from the scenario where defendants turn a blind eye or fail to ask appropriate questions in the face of possible illegality." (Mot. at 11.) Interpretation of the evidence is squarely in the jury's purview. Having heard the circumstantial evidence discussed above, the jury had a rational basis to conclude that if unaware of Action's illegal activities, Defendant was indeed willfully blind to the illegality of the schemes. The charge was therefore appropriate, and Defendant's disagreement with the jury's understanding of the significance of the evidence does not warrant a new trial. Because there is no basis to find that the interests of justice require a new trial in this case, Defendant's motion for a new trial under Rule 33 is denied.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion is **DENIED**. An appropriate order follows.

/s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON, U.S.D.J.**

Orig: Clerk
cc: Parties